**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Case No. 06-cv-00188-REB

ROBIN V. TALLY,

     Applicant,

v.

JOE ORTIZ, Director, Colorado Department of Corrections,
RON LEYBA, Warden, San Carlos Correctional Facility, Pueblo, Colorado, and
JOHN SUTHERS, Attorney General, State of Colorado,

     Respondents.

---

## ORDER DENYING APPLICATION FOR WRIT OF HABEAS CORPUS

---

**Blackburn, J.**

     This matter is before me on the applicant's **Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254** [#1], filed February 2, 2006.  The respondent has filed an answer, and the applicant has filed a traverse.  I have reviewed both the record in this case and the applicable. law.  For the reasons discussed below, I conclude that the applicant is not entitled to the relief he seeks.

## I.  JURISDICTION

     I have jurisdiction over this matter under 28 U.S.C. § 2254(a).

## II.  FACTS

     The applicant, Robin V. Tally, was convicted of first degree murder in state court.  Tally shot and killed Tamera Krizman, a former co-worker of Tally's, on August 24, 1995.  Evidence presented at trial showed that Tally observed Kirzman's van parked in a parking lot.  Tally waited near the van for Kirzman to return.  When Kirzman returned to her van,

Tally shot her repeatedly as she stood near her van.  Tally then drove to the police station.  Tally reported to the police that he had just shot someone.  He then underwent a three-hour interview in which he admitted shooting and killing Tamera Krizman.

Initially, Tally entered a plea of not guilty.  In December, 1995, he withdrew that plea and entered a plea of not guilty by reason of insanity (NGI).  Tally then was advised of his rights and privileges under Colorado law in relation to his NGI plea.  On December 14, 1995, Tally was received at the Colorado Mental Health Institute for  (CMHI) for a sanity examination.  He did not cooperate during the sanity examination.  After examining a variety of information about Tally, Dr. David Johnson, a CMHI psychiatrist, concluded that Tally was sane at the time of the killing.  Vol. XII, p. 774.  In February, 1996, the court committed Tally to CMHI a second time for a determination of Tally's competence to stand trail.  In about April, 1996, Dr. Johnson reported his conclusion that Tally was incompetent to stand trial.  Neither Tally nor the state contested that finding.  The trial court ordered Tally to remain committed until restored to competence.

In May, 1996, the state filed a motion with the trial court seeking authority to involuntarily medicate Tally with antipsychotic drugs.  At a hearing on this motion, Dr. Johnson testified that since Tally's arrival at CMHI in February, 1996, Tally had been delusional and had become violent and extremely dangerous to others at CMHI.  Dr. Johnson reported that Tally had been medicated on an emergency basis for eight days, and that Tally had become less dangerous while on medication.  Dr. Johnson proposed continuing medication with approximately 200 mg of Haldol injected every few weeks.  Vol. V, pp. 59 - 60.  On May 20, 2006, the trial court authorized this treatment plan, and approved the involuntary administration of Haldol.  Vol. I, p. 279 - 280.

In late August, 1996, Dr. Johnson reported that Tally had been restored to competence, and would remain competent as long as he continued to take Haldol. After a hearing, the trial court found that Tally had been restored to competency, and ordered that Tally continue to take Haldol, including involuntary administration, if necessary. Vol. VI, pp. 43 - 48. The court later issued a written order. Vol. II, pp. 287 - 288. On October 10, 1996, Tally moved to rescind the trial court's order authorizing involuntary medication. Vol. II, p. 320 - 321. At a hearing on that motion and other motions, the court denied Tally's motion to rescind the involuntary medication order. Vol. VII, 47 - 53.

Tally's case was tried to a jury, beginning January 6, 1997, and the jury convicted Tally of first degree murder. Tally was sentenced to life in prison without parole. Additional facts are discussed below.

### III. CLAIMS

Tally asserts seven claims in his application.

1. Petitioner's Sixth and Fourteenth Amendment rights were violated when the state trial court denied Petitioner's request to stop involuntary psychotropic medication prior to trial, failed to hold an evidentiary hearing on Petitioner's request, failed to impose on the State the burden to prove that continued medication of Petitioner during trial was necessary for compelling and essential state interests, failed to consider less intrusive alternatives, and failed to consider the prejudicial impact of the medication on Tally's constitutional trial and due process rights.

2. The state trial court violated Tally's constitutional right to testify when it held that Tally validly had decided not to testify, even though Tally had informed the trial court that he was unable to testify and withstand examination because of the psychotropic medication that had been administered involuntarily.

3. The state trial court violated Petitioner's Sixth and Fourteenth Amendment rights when the trial court refused to instruct the jury about the significant alteration of Petitioner's mental processes and demeanor caused by the psychotropic medication that Petitioner had been ordered to take involuntarily.

4.  The state trial court violated Tally's right against self incrimination and right to due process of law when it permitted the State to use Tally's silence during a sanity examination to establish Tally's guilt beyond a reasonable doubt.

5.  After the State presented evidence during Tally's trial that Tally had "refused to talk" with the Colorado Mental Health Institute psychiatrist during a court ordered examination, the state trial court violated Tally's constitutional rights to cross examination and to due process of law when the court prohibited Tally from presenting evidence to the jury that his "refusal" was, in fact, the exercise of his constitutional right to remain silent on the advice of counsel.

6.  Colorado's statutory competency provision violates the Due Process Clause of the United States Constitution.

7.  The state trial court violated Tally's rights under *Miranda v. Arizona*, 384 U.S. 436 (1966) and *Davis v. United States*, 512 U.S. 452 (1994) when it permitted the prosecution to introduce Tally's statement to police even though Tally never waived his rights.

## IV.  TIMELINESS OF PETITION & EXHAUSTION

I agree with the respondents that Tally's application was filed within the applicable one year statute of limitations.  28 U.S.C. § 2244(d)(1).

Generally, exhaustion of available and adequate state court remedies is a prerequisite to a habeas corpus petition in federal court.  *Granberry v. Greer*, 481 U.S. 129 (1987); *Rose v. Lundy*, 455 U.S. 509 (1982); 28 U.S.C. § 2254(b).  State remedies are not deemed exhausted until the highest state appellate courts have had an opportunity to consider the merits of the claim that the petitioner seeks to present in federal court.  *See Pitchess v. Davis*, 421 U.S. 482 (1975).  The exhaustion of state remedies requirement in federal habeas cases dictates that a state prisoner must "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

The respondents concede that Tally properly exhausted his first, fifth, and seventh claims.  The respondents argue, however, that claims two, three, four, and six have not been exhausted properly.  Having carefully reviewed the record, I conclude that Tally has exhausted claims two, three, and four of his application.  Tally has given the Colorado state courts one full opportunity to resolve the issues he raises in these claims.

However, I conclude Tally has procedurally defaulted his claim six.  In his claim six, Tally argues that Colorado's statutory standard of competence to stand trial violates the Due Process Clause.

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  A claim of "fundamental miscarriage of justice" now often is viewed as requiring a claim of "actual innocence."  *See, e.g., Herrera v. Collins*,  506 U.S. 390, 404 - 405 (1993).

Tally first raised this issue in the Colorado appellate courts when he appealed the trial court's denial of his motion for post-conviction relief under Colo. Crim. P. 35(c).  On May 12, 2005, the Colorado Court of Appeals issued an opinion addressing Tally's appeal of the trial court's denial of relief under rule 35(c).  *People v. Tally*, No. 03CA1723 (Colo. App. 2003) (unpublished) (*Answer to petition*, Appx. C).  The court of appeals concluded that Tally was procedurally barred from raising this issue in a motion for post-conviction relief.  *Id*. at pp. 5-6.  Reviewing the record of Tally's direct appeal of his conviction, the Colorado Court of Appeals noted that Tally had raised the issue of his mental competency on direct appeal, and that the "issue of defendant's competency was fully and finally

litigated in the trial court and on direct appeal." *Id*., p. 5.  The court noted further that Tally

had not challenged the constitutionality of the Colorado competency standard in his direct

appeal.  *Id*., pp. 5 - 6.  "Consequently, we conclude that defendant is precluded from

further raising the issue of his mental competency in a Crim. P. 35 proceeding." *Id*., p. 6.

Tally then petitioned the Colorado Supreme Court for a writ of certiorari.  His petition was

denied by the Colorado Supreme Court without opinion.  *Answer to petition*, Appx. A.

When the "last reasoned opinion" on a claim explicitly imposes a procedural default

under state law, a federal habeas court presumes that a later decision rejecting the same

claim also was based on the procedural default.  ***Ylst v. Nunnemaker***, 501 U.S. 797, 803 -

806 (1991).  The May 12, 2005, order of the Colorado Court of Appeals' in Tally's case is

a reasoned opinion that explicitly imposes a procedural default under state law on Tally's

challenge to the constitutionality of the Colorado competency standard.  Under ***Ylst*** I must

presume that the Colorado Supreme Court denied certiorari on the same basis.  Tally has

not alleged facts demonstrating cause and prejudice tied to his procedural default, nor has

he alleged facts demonstrating a fundamental miscarriage of justice.  Based on Tally's

procedural default of this claim, I may not hear Tally's challenge to the constitutionality of

the Colorado competency standard.  Thus, I will not address Tally's claim six on the

merits.

## IV.  STANDARD OF REVIEW

The provisions of 28 U.S.C. § 2254, as amended by the Antiterrorism and effective

Death Penalty Act of 1966 (AEDPA), govern Tally's petition.  Section 2254(d) establishes

a standard of habeas review known as AEDPA deference.  ***See, e.g., Brown v. Uphoff***,

381 F.3d 1219, 1223 (10th Cir. 2004).  Under this standard, habeas corpus relief may not

be granted on a claim adjudicated on the merits in state court proceedings unless the

state court adjudication: 1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or 2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

A state court decision is contrary to clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently on a set of materially indistinguishable facts.  *Penry v. Johnson*, 532 U.S. 782, 792 - 93 (2001).  A habeas petitioner challenging a state court's ruling must show that the state court's decision was objectively unreasonable, not merely erroneous, incorrect, or contrary to what a federal court might decide on direct appeal.  *See Bell v. Cone*, 535 U.S. 685, 694 (2002); *Williams v. Taylor*, 529 U.S. 362, 410-11 (2000).  The applicable clearly established law is based on "Supreme Court precedent as it existed when the state court reached its decision." *Brown*, 381 F.3d at 1224 n. 4.  The "clearly established" phrase of § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of (the Supreme) Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.

In the course of reviewing state criminal convictions in federal habeas corpus proceedings, a federal court does not sit as a super-state appellate court.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Pulley v. Harris*, 465 U.S. 37, 41 (1984).  "When a federal district court reviews a state prisoner's habeas [application] pursuant to 28 U.S.C. § 2254 it must decide whether the [applicant] is 'in custody in violation of the Constitution or laws or treaties of the United States.'  The court does not review a judgment, but the lawfulness of the [applicant's] custody

7

*simpliciter*." ***Coleman v. Thompson***, 501 U.S. 722, 730 (1991).  When a state court

adjudicates a federal issue relying solely on a state standard that is at least as favorable to

the applicant as the federal standard, the reviewing court may presume an adjudication on

the merits and apply AEDPA deference.  ***See Harris v. Poppell***, 411 F.3d 1189, 1196

(10th Cir. 2005).

Factual findings made by the state trial and appellate courts are presumed correct,

with the applicant having the burden of rebutting this presumption by clear and convincing

evidence.  28 U.S.C. § 2254(e)(1); ***Darks v. Mullin***, 327 F.3d 1001, 1007 (10th Cir. 2003).

"[W]hether a state court's decision was unreasonable must be assessed in light of the

record [that court] had before it."  ***Holland v. Jackson***, 542 U.S. 649, 651-52 (2004) (*per

curiam*) (citations omitted).

## V.  CLAIM ONE

Tally claims that his rights under the Sixth and Fourteenth Amendments were

violated when the trial court denied his request to stop the involuntary administration of

psychotropic medication before trial.  Again, on May 20, 1996, the trial court ordered that

Tally be medicated involuntarily.  On October 10, 1996, Tally filed a motion to terminate

the involuntary medication.  The trial court denied this request, relying on the evidence

and its findings from the May, 1996, hearing and the court's subsequent order.  Vol. VII,

pp. 47 - 53.  Tally argues that this was error because a) the court failed to hold an

evidentiary hearing on Tally's request; b) the court failed to require the state to prove that

continued medication of Tally was necessary to serve a compelling and essential state

interest; c) the court failed to consider less intrusive alternatives; and  d) the court failed to

consider the prejudicial impact of the medication on Tally's rights.

In *Riggins v. Nevada*, the United States Supreme Court granted certiorari to determine"whether forced administration of antipsychotic medication during trial violated rights guaranteed by the Sixth and Fourteenth Amendments."  504 U.S. 127, 132 (1992). David Riggins, a defendant charged with murder, voluntarily took an antipsychotic drug, Mellaril, during pretrial detention.  *Id*. at 129.  Shortly before his trial was to begin, Riggins sought an order from the trial court suspending the administration of Mellaril and one other drug.  Riggins argued that the administration of these drugs infringed on his freedom, and that the effect of the drugs "on his demeanor and mental state during trial would deny him due process."  *Id*. at 130.  Riggns argued also that he would offer an insanity defense at trial and that he had a right to show jurors his true mental state at trial.  *Id*.

At a hearing on Riggins' motion, one doctor opined that Riggins would become incompetent to stand trial if he was taken off of Mellaril.  Two other doctors gave varying conclusions about the effect of Mellaril on Riggins, and the possible consequences of taking Riggins off of Mellaril.  *Id*. at 130 - 131.  The trial court denied Riggins' motion to terminate medication in a short order that gave no indication of the court's rationale.  *Id*. at 131.  Riggins went to trial while on a high dose of Mellaril.  He testified at his trial, and he was convicted and sentenced to death.

In *Riggins*, the Supreme Court concluded that "once Riggins moved to terminate administration of antipsychotic medication, the State became obligated to establish the need for Mellaril and the medical appropriateness of the drug."  *Id*. at 135.  The state "certainly would have satisfied due process if the prosecution had demonstrated, and the District Court had found, that treatment with antipsychotic medication was medically appropriate and, considering less intrusive alternatives, essential for the sake of Riggins' own safety or the safety of others."  *Id*. at 135.  The Court noted also that the state "might

9

have been able to justify medically appropriate, involuntary treatment with the drug by
establishing that it could not obtain an adjudication of Riggins' guilt or innocence by using
less intrusive means." *Id*. at 135 - 136 (citation omitted).  However, the court noted that
the use of involuntary medication to maintain or restore a defendant's competence was
not at issue in ***Riggins***.  *Id*. at 136.

In this case, the trial court found by clear and convincing evidence that treatment
with antipsychotic medication was necessary to "prevent the likelihood of [Tally] causing
serious bodily harm to others at the institution."  279. The court found also that treatment
was necessary to prevent "a significant and likely long-term deterioration in the
defendant's mental condition," and that less intrusive alternative treatments had been
unsuccessful.  *Id*.  The court noted the side effects of the antipsychotic medications and
Tally's interests in refusing treatment, and concluded that the need for treatment was
sufficiently compelling to override those interests.  *Id*. at 279 - 280.

Five months later, Tally moved to rescind the trial court's order authorizing
involuntary medication.  Vol. II, p. 320 - 321.  In his motion, Tally argued that the court no
longer had the authority to require involuntary medication because Tally had been
restored to competence.  He did not argue that his medications would impair his trial
rights.  At a hearing on this motion, Tally's counsel supplemented the motion, arguing that
Tally would be a different person at trial while medicated than he would be if not
medicated.  Vol. VII, p. 49.  Counsel argued that Tally had a difficult time understanding
and assisting in his defense, and would have difficulty responding to cross examination, if
he testified.  *Id*.  Defense counsel again noted the possible side-effects of the medication,
an issue the trial court considered and addressed in its May, 1996, order.  *Id*. at 51.
Responding to this motion, the trial court noted the applicability of ***Riggins***, and re-

affirmed its earlier findings and conclusions concerning involuntary medication.  The court noted also that previous testimony indicated that Tally wold not be in a position to aid his defense if he did not take his medication.  *Id*. at 50.  On this basis, the court ordered the continuation of the previously ordered involuntary medication during trial.

I find and conclude that the trial court's order requiring involuntary medication of Tally during trial was not contrary to the law that was established clearly in *Riggins*, and does not constitute an unreasonable application of that clearly established federal law. Consistent with the rule established in *Riggins*, the trial court found, based on clear and convincing evidence, that treatment of Tally with "antipsychotic medication was medically appropriate and, considering less intrusive alternatives, essential for the sake of . . . the safety of others." *Riggins*, 504 U.S. at 135; Vol. I, pp. 279 - 280 (May 20, 1996 order); Vol. VII, pp. 47 - 51.  The trial court heard extensive testimony about the effects the medication would have on Tally, including the possible side-effects, and that issue was raised again in the November, 1996, hearing.  The trial court concluded that both the continuing concern for the safety of others and Tally's interest in being able to assist his defense were important interests that were served by the involuntary medication.  *Id*.  In its May, 1996, order, the court found that there were no viable alternatives to involuntary medication, and the court again adopted that finding in the November, 1996, hearing.  The record demonstrates that the effect of the medication was to reduce substantially Tally's delusional thinking, and to restore him to rational thinking.  Vol. VI, pp. 4 - 48.  Except for the effect of the medication on Tally, nothing in the record indicates that any of the bases for the trial court's May, 1996, order had changed significantly as of November, 1996.

In sum, the trial court held a hearing on the issue of medicating Tally involuntarily. The trial court found, by clear and convincing evidence, that medication of Tally was

necessary to serve a compelling and essential state interest.  The trial court considered

less intrusive alternatives, and concluded that they were not viable.  The trial court

considered also the impact of involuntary medication on Tally's rights, and concluded that

the compelling and essential state interests outweighed this consideration.  The

evidentiary basis for the trial court's findings is substantial and legally adequate.

Tally requested later that the trial court again hold a hearing on this issue, but

nothing in the record indicates that any of the bases of the trial court's earlier findings and

conclusions had changed in any significant way.  Absent some demonstration of a

significant change in the bases for the trial court's original order, the trial court was not

required to hold another hearing simply because Tally requested a hearing.  Therefore, I

conclude that the rulings of the trial court and the Colorado Court of Appeals on the issue

of Tally's involuntary medication were not contrary to clearly established federal law, as

established in *Riggins v. Nevada*, 504 U.S. 127 (1992) and related cases, and did not

involve an unreasonable application of that clearly established federal law.

## VI.  CLAIM TWO

In claim two, Tally argues that the trial court erroneously concluded that Tally had

made a knowing and voluntary decision not to testify at trial.  Tally claims his decision was

not voluntary because of the effects of the antipsychotic medication.  He argues that the

trial court improperly treated his decision as voluntary, relying solely on the trial court's

conclusion that Tally was competent to stand trial.

On Friday, January 10, 1997, during his trial, Tally was advised by the court that he

had the right to testify, that the choice to testify or not testify was his alone, and that he

could choose to testify even though his counsel advised otherwise.  Tally indicated that he

understood these rights, and that he knowingly and voluntarily chose not to testify.  Vol.

XII, pp. 916 - 918.  The trial court applied the standards of **People v. Curtis**, 681 P.2d 504 (Colo. 1984) in giving this advisement.  The following Monday morning, Tally told the court that his decision not to testify was not "altogether a voluntary one."  Vol. XII, pp. 919 - 920. He claimed that his mediation prevented him from undergoing direct and cross examination, and that he might have made a different decision if he were not medicated. The trial court noted that it had found Tally to be competent, and that it assumed, therefore, that Tally had the capacity to make a valid decision to testify or not to testify. Vol. XII, p. 920.  The Colorado Court of Appeals found no error in the trial court's conclusion that Tally's decision was knowing and voluntary.  **People v. Tally**, 7 P.3d 172, 179 (Colo. App. 1999).

> A finding that a defendant is competent to stand trial . . . is not all that is necessary before he may be permitted to plead guilty or waive his right to counsel. In addition to determining that a defendant who seeks to plead guilty or waive counsel is competent, a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary.

**Godinez v. Moran**, 509 U.S. 389, 400 (1993).  The same considerations of competence and a knowing and voluntary decision are applicable to a criminal defendant's decision to testify or not to testify.

Except for Tally's statement to the court on Monday morning, nothing in the record indicates that the medication administered to Tally made his decision not to testify involuntary.  All of the evidence in the record indicates that Tally was more rational, realistic, and controlled when he was on the medication.  The trial court's advisement under **Curtis** was timely and complete, and Tally's response to the advisement bears no indication that Tally's decision not to testify was anything other than knowing and voluntary.  The evidence in the record, including the trial court's advisement under **Curtis**, provide ample basis for the two key conclusions: 1) that Tally was competent to stand trial;

and 2) that his decision not to testify was knowing and voluntary.  Tally's Monday morning *ad hoc* assertion that he might have made a different decision if he were not on antipsychotic medication does not amount to an assertion that required the trial court to make a second determination of the voluntariness of Tally's decision.

Tally claims that the trial court's refusal to re-examine the voluntariness of his decision not to testify after Tally's Monday morning statement violates law clearly established in *Johson v. Zerbst*, 304 U.S. 458 (1938); *Brooks v. Tennessee*, 406 U.S. 605 (1972);  *Edwards v. Arizona*, 451 U.S. 477 (1981); *Rock v. Arkansas*, 483 U.S. 44 (1987);and *Godinez v. Moran*, 509 U.S. 389 (1993).  I have reviewed these cases, and I conclude that the decisions of the trial court and of the Colorado Court of Appeals on this issue were not contrary to clearly established federal law, as established in these cases, and did not involve an unreasonable application of that clearly established federal law.

## VII.  CLAIM THREE

Tally's counsel requested repeatedly that the trial court instruct the jury about the effects the antipsychotic medication had on Tally.  This request was made before the trial, after the jury was selected, during the trial, and after the completion of the evidence.  Tally's proposed instruction is shown at Vol. II, p. 443.  The proposed instruction states that Tally "is being given large doses of antipsychotic medication against his will" and that the medication "severely affects Mr. Tally's mental processes as well as his outward appearance and demeanor."  *Id*.  The trial court refused to give this instruction.  Evidence presented at trial demonstrated that Tally was on medication, and indicated the effects the medication had on Tally's demeanor.  The Colorado Court of Appeals concluded that the trial court properly refused to give Tally's proposed instruction.  *People v. Tally*, 7 P.3d 172, 177 (Colo. App. 1999).  Noting that several witnesses testified that Tally was being

treated with drugs and testified about the effect of the drugs on Tally's behavior, the Court of Appeals concluded that the instruction improperly "would have directed the jury to accept, as fact, part of a witness' testimony." *Id*.

Tally argues that the jury in his case "relied upon [Tally's] chemically induced and manipulated demeanor and conduct in court to render a decision . . . [and] he had the right under the Due Process and Trial by Jury Clauses to have the jury informed of the truth concerning this matter." *Petition*, p. 43.  However, none of the cases Tally cites, particularly the opinions issued by the United States Supreme Court, establishes that a trial court must give the type of instruction requested by Tally under the circumstances of this case.  Having reviewed the authority cited by Tally, I conclude that the rulings of the trial court and the Colorado Court of Appeals on this issue were not contrary to clearly established federal law, and did not involve an unreasonable application of clearly established federal law.

## VIII.  CLAIM FOUR

Tally claims that the trial court erred when it admitted evidence that Tally would not talk to Dr. David Johnson, a staff psychiatrist at the Colorado Mental Health Institute (CMHI), when Dr. Johnson sought to talk to Tally for the purpose of conducting a sanity evaluation.  Dr. Johnson was the prosecution's final witness at trial.  He testified that in his opinion Tally was sane when he shot the victim.  Vol. XII, p. 774.  Before Dr. Johnson testified, the trial court instructed the jury that it could consider Dr. Johnson's testimony on the issue of insanity, but that it was not to consider his testimony "in determining the guilt or innocence of the elements of the charge filed."  Vol. XI, p. 738.

Again, Tally entered CMHI on December 14, 1995.  He did not cooperate during the sanity examination conducted by Dr. Johnson during this visit.  In February, 1996, the

court committed Tally to CMHI a second time for a determination of Tally's competence to stand trail.  Dr. Johnson participated also in the competency examination.

At trial, Dr. Johnson testified about the types of information he considers in making sanity evaluations.  Vol. XII, pp. 761 - 762.  Dr. Johnson then testified that he was not able to interview Tally as part of his sanity evaluation, during Tally's first visit to CMHI, because Tally refused to talk with Dr. Johnson.  Vol. XII, p. 762.  Dr. Johnson then explained that he was able to form an opinion about Tally's sanity because he had "an abundance of other information" on which to base his opinion.  Vol. XII, p. 762.  Dr. Johnson summarized the information on which his opinion was based, and testified that in his opinion Tally was legally sane when he shot the victim.  Vol. XII, p. 774.  The bases for Dr. Johnson's opinion were reviewed in detail, but Dr. Johnson did not testify that Tally's silence was one reason for Dr. Johnson's conclusion that Tally was sane at the time of the offense.  Vol. XII, pp. 775 - 886.  Dr. Johnson did note that Tally's examining psychiatrist, Dr. Robert Atwell, had "an advantage" in forming an opinion because Tally did talk to Dr. Atwell.  Vol. XII, p. 771.  Dr. Atwell testified that, in his opinion, Tally was insane at the time of the killing.  Vol. XII, p. 1077.

Dr. Johnson testified also that Tally's condition deteriorated after his arrest and incarceration. Vol. XII, p. 785.  Dr. Johnson testified that when he saw Tally during Tally's second stay at CMHI, Tally was "very psychotic."  Vol. XII, p. 788.  Dr. Johnson described Tally as very talkative during this second visit to CMHI.  Dr. Johnson testified also that if Tally "had been a psychotic or even anywhere near psychotic at the time of the crime, it would have manifested itself very prominently on the video [taped confession]."  Vol. XII, p. 789.  Dr. Johnson noted that he did not see signs of psychosis in the videotape of Tally's August, 1995, statement to police just after the victim was shot and killed.  Vol. XII,

pp. 788 - 789.

Tally argues, in essence, that Dr. Johnson described Tally's psychosis as progressively worsening after Tally's first visit to CMHI, and described Tally's talkativeness during Tally's second visit to CMHI as an indicator of psychosis.  In this context, Tally argues, evidence of Tally's refusal to talk to Dr. Johnson during Tally's first visit to CMHI was used as an indication that Tally was sane during that visit.  *Petition*, p. 62.

The Colorado Court of Appeals concluded that Dr. Johnson's testimony that Tally did not cooperate during Dr. Johnson's sanity exam properly was admitted at trial.  The court of appeals noted that while "evidence of the defendant's refusal to cooperate in his psychiatric examination was admitted, the expert witness placed little, if any, weight upon that refusal in reaching his opinion that defendant was sane." ***People v. Tally***, 7 P.3d 172, 183 (Colo. App. 1999).  The Court of Appeals concluded also that a "defendant's sanity is not an element of the offense.  Hence, a defendant's right against self-incrimination is not implicated when testimony is admitted only for the purpose of establishing a defendant's sanity." ***People v. Tally***, 7 P.3d 172, 182 (Colo. App. 1999). In addition, the Court of Appeals noted that Tally was informed that his non-cooperation in a sanity exam could be referred to at trial, and that the jurors were instructed that they could consider Tally's silence only on the issue of Tally's mental state. ***Id***.

Tally argues that the trial court's admission of Dr. Johnson's testimony indicating that Tally refused to talk to Dr. Johnson, and the Colorado Court of Appeals opinion upholding that decision, constitute an unreasonable application of clearly established federal law announced in ***Doyle v. Ohio***, 426 U.S. 610 (1976) and ***Wainwright v. Greenfield***, 474 U.S. 284 (1986).  In ***Doyle***, the defendants testified at trial and offered an exculpatory explanation for their participation in what the state had portrayed as a routine

marijuana transaction.  On cross-examination, the prosecutor attempted to impeach this testimony by asking the defendants why they had not explained their conduct when they were arrested.  *Doyle*, 426 U.S. at 613 - 620.  The Supreme Court held that such cross-examination violated the Due Process Clause because it sought to use the defendants' silence at the time of their arrest as evidence of their guilt.  *Id*. at 619 - 620 .

In *Wainwright* the defendant was read his *Miranda* rights after his arrest.  474 U.S. 284, 286.  He declined to talk to the arresting officers, and said he wanted to talk to an attorney.  *Id*.  The defendant later pled not guilty by reason of insanity.  In closing argument, the prosecutor argued that the defendant's "repeated refusals to answer questions without first consulting an attorney demonstrated a degree of comprehension that was inconsistent with his claim of insanity."  *Id*. at 287.  The Court held that the use of the defendant's silence, which occurred after he was given *Miranda* warnings, to challenge his insanity plea was improper.

> The point of the *Doyle* holding is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise by using the silence to impeach his trial testimony.  It is equally unfair to breach that promise by using silence to overcome a defendant's plea of insanity.  In both situations, the State gives warnings to protect constitutional rights and implicitly promises that any exercise of those rights will not be penalized.  In both situations, the State then seeks to make use of the defendant's exercise of those rights in obtaining his conviction. The implicit promise, the breach, and the consequent penalty are identical in both situations.

*Id*. at 292.

This case differs substantially from *Wainwright*.  First, nothing in the record indicates that Tally's refusal to speak to Dr. Johnson was presented as a basis for Dr. Johnson's conclusion that Tally was sane at the time of the crime.  Although Dr. Johnson noted Tally's silence, Dr. Johnson did not explicitly or impliedly cite Tally's silence as a

basis for his opinion about Tally's sanity.  Dr. Johnson noted that a patient's silence sometimes leaves him without an adequate basis to form an opinion on sanity.  Vol. XII, p. 763.  In Tally's case, however, Dr. Johnson noted that he could form an opinion about Tally's sanity because he had "such an abundance of other information" on which he could base his opinion.  *Id.*  Again, Dr. Johnson never cited Tally's silence as a reason to think Tally was sane at the time of the offense.

Second, the "implicit promise" that a defendant's silence will not be used against him is not present in this case.  Before the sanity evaluation, Tally was given an advisement by the trial court concerning his plea of not guilty by reason of insanity, and the sanity evaluation.  Vol. III, pp. 4 - 14.  The court told Tally: "The fact that you are not cooperative with a psychiatrist or other personnel conducting the examination may be admissible in your trial on the issues of insanity or competency."  Vol. III, p. 5.  Dr. Johnson's sanity evaluation was admitted after the jury was instructed that it could consider Dr. Johnson's testimony on the issue of sanity, but it could not consider his testimony "in determining the guilt or innocence of the elements of the charge filed."  Vol. XI, p. 738.

The holdings in *Doyle* and *Wainwright* are based on a breach of an implicit promise in *Miranda* warnings that a defendant's silence will not be used against him. Nothing in the record indicates that Tally understood that such a promise, implicit or explicit, was applicable when Dr. Johnson sought to talk to Tally as part of his sanity evaluation.  Rather, Tally had been advised specifically that evidence of his silence in the context of a sanity evaluation could be admitted in evidence on the issue of sanity.  Dr. Johnson's statement concerning Tally's silence was admitted on precisely this basis.  In Tally's case, there was no breach of the type of implicit promise discussed in *Doyle* and

19

*Wainwright*.  Further, unlike *Wainwright*, the record in this case does not demonstrate that Dr. Johnson relied on Tally's silence as a basis for Dr. Johnson's conclusion on the sanity question.  Given these differences between this case and *Doyle* and *Wainwright*, I conclude that the opinion of the Colorado Court of Appeals on this issue is not contrary to the federal law that was clearly established in these cases, and did not involve an unreasonable application of this clearly established federal law.

I note additionally that the Colorado Court of Appeals relied on *People v. Johnson*, 470 P.2d 37 (Colo. 1970) in concluding that the admission of Dr. Johnson's testimony indicating that Tally would not talk to Dr. Johnson did not violate Tally's privilege against self-incrimination.  *People v. Tally*, 7 P.3d 172, 182 (Colo. App. 1999).  In *Johnson*, the Colorado Supreme Court noted that a defendant who raises a mental defense still has the right to remain silent during a court ordered examination.  *Johnson*, 470 P.2d at 40.  However, the court concluded that when a defendant pleads not guilty by reason of insanity, evidence that the defendant did not cooperate during a sanity examination is admissible on the question of the defendant's sanity.  *Id*. at 77 - 78.  Johnson's trial was bifurcated, and the evidence of his non-cooperation was found to be admissible in his sanity trial.  The Colorado Court of Appeal's opinion in Tally's case indicates that it extended the *Johnson* rationale to Tally's trial, which was not bifurcated.  *People v. Tally*, 7 P.3d at 182.

In *Buchanan v. Kentucky*, the United States Supreme Court considered the prosecution's use of the testimony of an expert who had conducted a pretrial psychiatric exam of the defendant.  483 U.S. 402, 423 - 424.  The prosecution introduced this evidence in response to the defendant's evidence of a claimed extreme emotional

disturbance. *Id*. The defendant had introduced the testimony of a social worker in support of his defense of extreme emotional disturbance. *Id*. at 409 - 410.  The Court concluded that

> if a defendant requests [a psychiatric] evaluation or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested. The defendant would have no Fifth Amendment privilege against the introduction of this psychiatric testimony by the prosecution.

*Buchanan v. Kentucky*, 483 U.S. 402, 422-423 (1987) (citations omitted).   As the respondents note, the United States Supreme Court has not expressly extended the fairness rational of *Buchanan* to include the admission of evidence of the defendant's refusal to speak with a mental health examiner. *Response*, p. 98.  However, such an extension has not been rejected by the United States Supreme Court.

Having considered *Buchanan* and related Supreme Court cases, I conclude that the extension of the fairness rationale of *Johnson* and *Buchanan* to this case was reasonable.  The Colorado Court of Appeals' extension of this rationale to this case was not contrary to clearly established federal law, and did not involve an unreasonable application of clearly established federal law.

## IX.  CLAIM FIVE

In claim five, Tally argues that the trial court improperly precluded Tally's counsel from questioning Dr. Johnson to get Dr. Johnson to testify that Tally had refused to be interviewed by Dr. Johnson based on advice from Tally's counsel.  In addition, Tally claims that the trial court improperly excluded evidence from Tally's expert, Dr. Atwell, indicating that Tally was willing to talk during his second visit to CMHI because Tally's attorneys had advised Tally to talk.  Tally claims the exclusion of this evidence violated his Fifth

Amendment right to confront the witnesses against him, and his due process right to present a defense.

The trial court concluded that evidence that Tally refused to talk to Dr. Johnson based on advice from Tally's counsel was irrelevant.  The Colorado Court of Appeals agreed.  ***People v. Tally***, 7 P.3d 172, 183 (Colo. App. 1999).  The Court of Appeals noted that

> (w)hile evidence of defendant's refusal to cooperate in his psychiatric examination was admitted, the expert witness placed little, if any, weight upon that refusal in reaching his opinion that defendant was sane.  Rather, his opinion was based upon a review of defendant's history and his observation of the defendant during trial.

> Given the broad discretion that a trial court may exercise with respect to the admission of evidence . . . and the nature of the expert's testimony, we conclude that the court here committed no prejudicial error in refusing the proffered evidence.

***Id***.

As discussed in claim four above, Tally claims the prosecution used evidence of his refusal to cooperate in his sanity examination to prove that Tally was sane when the crime was committed.  This is so, Tally claims, because Dr. Johnson testified that Tally refused to talk to Dr. Johnson during Tally's first visit to CMHI, in December, 1995, but Tally was very talkative during his second visit to CMHI, in February, 1996.  In other words, Tally argues that his silence during the first sanity examination was used to show that he was sane at that time, while his later talkativeness was used to show that he later descended into mental illness.  If his silence was used in this way, Tally argues, he should have been permitted to cross examine Dr. Johnson and to present evidence, via Dr. Atwell, to explain his silence and his later talkativeness.  He claims that the rulings of the state courts on this evidence violates law clearly established in ***Delaware v. Van Arsdall***, 475 U.S. 673

(1986); *Alford v. United States*, 282 U.S. 687 (1931);   *Chambers v. Mississippi*, 410

U.S. 284 (1973);   *Crane v. Kentucky*, 476 U.S. 683 (1986);   *Washington v. Texas*, 388

U.S. 14 (1967)   and   *United States v. Nixon*, 418 U.S. 683 (1974).  I disagree.

Trial judges have wide latitude under the Confrontation Clause to impose

reasonable limits on cross examination that is prejudicial, confusing, repetitive, or "only

marginally relevant."  *Delaware v. Van Arsdall*, 476 U.S. at 679.  I agree with the

Colorado Court of Appeals that the trial court's refusal to admit evidence of the reasons for

Tally's silence and later talkativeness was well within the trial court's discretion to limit

cross examination by excluding testimony that is not relevant, or only marginally relevant.

This is not a situation like the situation discussed in *Chambers* in which the defendant

was precluded from cross examining a key hostile witness concerning the witness's

recollection, his alibi, or his conscience.  410 U.S. 295.  In contrast to Tally's case, the

evidence at issue in *Chambers* was fundamental to Chamber's defense.  Again, the

evidence in question here reasonably was found to be irrelevant.

The rulings of the trial court and the Colorado Court of Appeals on this issue were

not contrary to the law that was clearly established in the Supreme Court cases cited

above, and they did not involve an unreasonable application of that clearly established

federal law.

## X.  CLAIM SEVEN

In claim seven, Tally claims that his video taped confession improperly was

admitted at trial because Tally had not validly waived his *Miranda* rights before giving the

statement.  Again, Tally appeared at the front desk of the Lakewood police station, said he

had shot someone, was frisked, and then arrested.  Subsequently, Tally was interviewed

by Detectives Richardson and Connelly.  Richardson read Tally his *Miranda* rights at the

beginning of the interview.  *People's Exhibit* 10, p. 815 (*Exhibit* 10) (transcript of interview, bates numbered 815 to 915).  Asked if he understood his rights, Tally said "I understand what you're saying."  *Id*., p. 816.  Richardson then said that he needed to find out "what's going on," and said that Tally obviously wanted to "take care of the problem or you wouldn't have turned yourself in from the get go.  Ah, do you understand your rights?"  *Id*., p. 816.  Tally responded by saying "I understand what you're saying to me.  I guess what it is, are you saying to me that I, that I should have an attorney present while you question me?"  *Id*.  Richardson responded: "That's not what I'm saying, and Ill read 'em to you again."  *Id*.

Richardson again read Tally his ***Miranda*** rights and asked Tally if he understood his rights.  Tally said: "I understand."  *Id*.  Richardson then said "I can't talk to you without advising you of your rights.  Having these rights, um do you wanna talk to us at this time?"  *Id*.  Tally responded: "Um, well the thing that I'm looking at later on is I wanna talk to you, but I also, I don't wanna have an attorney come to me and tell me, . . . this is not what you should've done."  *Id*.  Richardson said "I can't control what attorneys will tell ya."  *Id*.  After a bit more discussion, Richardson asked Tally "so, will you talk to me?"  *Id*., p. 817.  Tally responded: "Yeah, I'll talk to you."  *Id*.

The trial court found that, considering the totality of the circumstances, Richardson properly informed Tally of his ***Miranda*** rights, determined that Tally understood his rights, and that there were no threats, promises, or other forms of coercion that influenced Tally's waiver of his ***Miranda*** rights.  The trial court found that Tally voluntarily, knowingly, and intelligently waived his ***Miranda*** rights, and that Tally's statements concerning a lawyer were not a request to be represented by counsel.  Vol. VII, pp. 167 - 169.  The Colorado Court of Appeals agreed that Tally had made a knowing and voluntary waiver of his rights.

*Tally*, 7 P.3d at 180.  In addition, the Colorado Court of Appeals concluded that Tally's references to an attorney did not constitute a clear, unambiguous request for counsel under ***Edwards v. Arizona***, 451 U.S. 477 (1981) or ***Davis v. U.S.***, 512 U.S. 452 (1994). *Id*. at 181 - 182.  Thus, the Colorado Court of Appeals concluded that Tally's statements to Richardson and Connelly properly were admitted at trial.  *Id*.

Tally argues that because he made an ambiguous reference to counsel before he agreed to waive his rights and answer questions, and he then was not re-advised of his rights, his waiver of his ***Miranda*** rights cannot be seen as knowing and voluntary.  *Petition*, pp. 81 - 82.  He argues that the Colorado Court of Appeals improperly "collapsed the ***Miranda*** waiver standard and the ***Davis*** invocation standard" to determine that Tally had made a knowing and voluntary waiver of his ***Miranda*** rights.  *Petition*, pp. 82 - 83.  He claims that the Colorado Court of Appeals' decision is contrary to and is an unreasonable application of the law established in ***Miranda*** and ***Davis***.  I disagree.

In ***Davis***, the Court held that "after a knowing and voluntary waiver of the ***Miranda*** rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney."  ***Davis***, 512 U.S. at 461.  In ***Davis***, the defendant waived his ***Miranda*** rights orally and in writing, but later made an ambiguous and equivocal reference to consulting an attorney.  The Court concluded that this did not constitute an effective invocation of the suspect's right to an attorney following his earlier waiver of his ***Miranda*** rights.  *Id*. at 462.

Tally argues that he did not validly waive his ***Miranda*** rights because he "at least made an ambiguous invocation of one of those rights, the right to counsel," before he made any statement that can be read as a waiver of his rights.  *Traverse*, p. 53.  Tally's references to an attorney, quoted above, easily fall within what the ***Davis*** court defined as

ambiguous or equivocal references to an attorney.  These references were made contemporaneously with three readings of the *Miranda* rights to Tally, and three indications by Tally that he understood those rights.  Considering all of the circumstances, the record readily supports the conclusion that Tally's waiver of his *Miranda* rights was knowing, voluntary, and intelligent.  Nothing in *Davis* or other relevant case law indicates that Tally's ambiguous reference to an attorney precludes a subsequent valid waiver of *Miranda* rights under the circumstances of Tally's interview.  The rulings of the trial court and the Colorado Court of Appeals on this issue were not contrary to clearly established federal law, and did not involve an unreasonable application of clearly established federal law.

### XI.  CONCLUSION & ORDERS

I conclude that review of Tally's claim six is barred because that claim was procedurally defaulted in state court.  On each of Tally's other claims, I conclude that the rulings of the trial court and the Colorado Court of Appeals were not contrary to clearly established federal law, and did not involve an unreasonable application of clearly established federal law.

**THEREFORE IT IS ORDERED** as follows:

1. That the applicant's **Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254** [#1], filed February 2, 2006. is **DENIED**; and

2. That this case is **DISMISSED**.

Dated November 2, 2006, at Denver, Colorado.

BY THE COURT:

**s/ Robert E. Blackburn**
**Robert E. Blackburn**
**United States District Judge**